**FILED**

**DEC 1 8 2007**

CLERK, U.S. BANKRUPTCY
ORLANDO DIVISION

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re:

DANA BUMGARNER and
REBECCA BUMGARNER,

      Debtors.

_____/

Case No. 6:06-bk-02126-ABB
Chapter 7

ALTA ONE FEDERAL CREDIT UNION,

      Plaintiff,

vs.

DANA BUMGARNER and
REBECCA BUMGARNER,

      Defendants.

_____/

Adv. Pro. No. 6:06-ap-00159-ABB

## MEMORANDUM OPINION

This matter came before the Court on the Complaint (Doc. No. 1) filed by Alta One Federal Credit Union, the Plaintiff herein ("Plaintiff"), against Dana Bumgarner, a/k/a D. Neil Bumgarner, and Rebecca Bumgarner, the Debtors and Defendants herein (collectively, the "Debtors"), in which the Plaintiff objects to the discharge of a debt pursuant to 11 U.S.C. Section 523(a)(2)(A). An evidentiary hearing was held on September 25, 2007 at which the Debtors, counsel for the Debtors, a representative of the Plaintiff, and Plaintiff's counsel appeared. The Court makes the following Findings of Fact and Conclusions of Law after reviewing the pleadings and evidence, hearing live testimony and argument, and being otherwise fully advised in the premises.

## FINDINGS OF FACT

The Debtors filed the above-captioned joint Chapter 7 case on August 24, 2006 ("Petition Date"). The Debtors had resided in California prepetition at 329 West Howell, Ridgecrest, California 93555 (the "Property"). They owned the Property jointly on the Petition Date and listed it as non-homestead property in Schedule A. Downey Savings and Loan ("Downey") held a first priority mortgage on the Property. The Plaintiff is a secured creditor of the Debtors pursuant to a series of home equity loans collateralized by the Property.

The Debtors submitted an application to the Plaintiff for a home equity loan in October 2004. An automated appraisal of the Property was conducted in October 2004 reflecting the Property had an upper value of $152,803.00 and equity of $39,331.61, after deduction of the Downey loan balance.[1] The Debtors were in communication with the Plaintiff during the loan approval process and understood the granting of a loan was dependent upon the appraisal results and the amount of the loan would be based upon the equity in the Property.

The Plaintiff approved a home equity loan with a $35,000.00 credit line, designated by the Plaintiff as Account Number 81257 "Loan 24" ("First Loan 24").[2] The Debtors executed the loan documents on October 14, 2004, which included a Credit Line Account Home Equity Secured Open-End Credit Agreement and Truth-In-Lending Disclosure and a Deed of Trust.[3] First Loan 24 was secured by the mortgage on the Property and was in second position to the Downey mortgage. The Debtors understood the Plaintiff held a second-position mortgage on the Property pursuant to First Loan 24.

---

[1] Plaintiff's Exh. No. 3.
[2] Plaintiff's Exh. No. 1.
[3] Id.

The Debtors sought approval from the Plaintiff of a new home equity loan in July 2005. Rebecca Bumgarner transmitted a letter to the Plaintiff detailing the Debtors' various debts and explaining a new loan based upon the "equity that we currently have on our home" would allow the Debtors to "payoff and consolidate" their debts.[4]

The Debtors requested the Plaintiff conduct a full appraisal, rather than an automated appraisal, in order to ascertain the highest possible Property value and maximize the equity calculation. A full appraisal was conducted and a Uniform Residential Appraisal Report was issued on July 26, 2005 ("Appraisal") appraising the Property at $195,000.00.[5] The equity, after deduction of the Downey mortgage, was calculated at $81,000.00.[6]

The Plaintiff, based upon the Appraisal, approved a home equity loan with a $68,000.00 credit line, designated by the Plaintiff as "Loan 25" ("Loan 25").[7] The Debtors executed the loan documents on August 16, 2005, which included a Credit Line Account Home Equity Secured Open-End Credit Agreement and Truth-In-Lending Disclosure and a Deed of Trust.[8] First Loan 24 was consolidated into Loan 25 and funds from Loan 25 were used to pay off the balance on First Loan 24 on August 22, 2005. The Plaintiff returned the First Loan 24 documents stamped "Paid" to the Debtors with a letter informing them the First Loan 24 encumbrance on the Property would be released.[9] The Debtors received these documents.

Loan 25 was secured by the mortgage on the Property and was in second position to the Downey mortgage. The Debtors understood the Plaintiff held a second-position

---

[4] Plaintiff's Exh. No. 4.
[5] Plaintiff's Exh. No. 7.
[6] Id.
[7] Plaintiff's Exh. No. 5.
[8] Id.
[9] Plaintiff's Exh. Nos. 1, 2.

3

mortgage on the Property pursuant to First Loan 25. The Debtors understood the Plaintiff at no time would agree to take a security interest position lower than second-position.

The Debtors again sought to increase their credit line and requested they be approved for a credit line of $81,000.00 representing 100% of the equity in their home, based upon the Appraisal. The Plaintiff granted the Debtors a new home equity loan with an $81,000.00 credit line on August 31, 2005 ("Loan 26").[10] The Debtors executed the loan documents on August 31, 2005, which included a Credit Line Account Home Equity Secured Open-End Credit Agreement and Truth-In-Lending Disclosure and a Deed of Trust.[11]

A representative of the Plaintiff had telephone communications with Dana Bumgarner prior to the closing of Loan 26 and explained the consolidation and payoff procedures for Loan 25 in detail. The Debtors understood the procedures and that Loan 25 would be paid off and closed.

Loan 25 was consolidated into Loan 26 and funds from Loan 26 were used to pay off the balance on Loan 25 on September 6, 2005. The Plaintiff returned the Loan 25 documents stamped "Paid" to the Debtors with a letter informing them the encumbrance on the Property would be released as to the Loan 25.[12] The Debtors received these documents.

Loan 26 was secured by the mortgage on the Property and was in second position to the Downey mortgage. The Debtors understood the Plaintiff held a second-position mortgage on the Property pursuant to Loan 26. The Debtors admitted they knew Loan 26

---

[10] Plaintiff's Exh. No. 9. The Plaintiff explained the Appraisal was only a few weeks old and was still valid for establishing equity for Loan 26.
[11] Id.
[12] Plaintiff's Exh. Nos. 5, 6.

was to pay off Loan 25 and the only open loan from which funds would be available to them was Loan 26 with a credit line of $81,000.00. The Debtors understood $81,000.00 was the maximum equity in the Property and was the maximum amount of credit for which they had been approved.

### Unclosed Loan 25

The Plaintiff erroneously failed to close out Loan 25 in its system after Loan 25 was paid off by Loan 26. The closing of a loan is done manually pursuant to the Plaintiff's standard operating procedures and the funding clerk responsible for the Debtors' account inadvertently failed to close out Loan 25. The Plaintiff's system, as a result, showed Loan 25 to be open with a $68,000.00 credit limit. The Debtors' bank statements erroneously showed Loan 25 was open.[13]

The Plaintiff provides on-line account access for its customers. The Debtors routinely accessed their account on-line and saw Loan 25 was not closed. The Debtors, between December 2005 and March 2006, made withdrawals totaling $68,198.00 from Loan 25.[14] The transfers were all made on-line.

The Debtors made the withdrawals knowing Loan 25 had been paid through Loan 26 and was no longer an open line of credit. The Debtors knowingly drew from the closed line of credit because "they needed the money." They understood the Property did

---

[13] Debtors' Exh. No. 1. The Debtors' September, October, and November 2005 bank statements contain a "Loan 25" section stating Loan 25 has a "Maximum Credit Line" of $68,000.00 and "Available Credit" of $68,000.00. The bank statements reflect the Debtors' withdrawals beginning on December 16, 2005.

[14] Plaintiff's Exh. No. 8. The Debtors first withdrew $1,000.00 on December 16, 2005. Their subsequent withdrawals were: $2,000.00 on December 17, 2005; $2,000.00 on December 18, 2005; $2,000.00 on December 23, 2005; $15,000.00 on January 2, 2006; $15,000.00 on January 2, 2006; $5,000.00 on February 2, 2006; $3,000.00 on February 2, 2006; $15,000.00 on February 14, 2006; $4,000.00 on March 7, 2006; $2,500.00 on March 10, 2006; and $1,698.00 on March 27, 2006. The Plaintiff states in its Complaint the Debtors made withdrawals of $67,999.68. This figure is incorrect in that it appears finance charges of $198.32 were included in its calculation.

not have sufficient equity to collateralize both the $68,000.00 credit line of Loan 25 and the $81,000.00 credit line of Loan 26.

The Plaintiff did not discover its Loan 25 error until March 2006 and was not aware of the Debtors' withdrawals because it does not monitor on-line transactions. The Debtors continued to make payments on Loan 25 while it erroneously remained open. Loan 25 would have gone into default and the Plaintiff would have discovered the closing error had the Debtors not made those payments.

The Debtors owed the Plaintiff $150,708.02, consisting of the withdrawals of $68,198.00 plus the balance of Loan 26, when the Plaintiff became aware of the Loan 25 withdrawals. The $68,198.00 debt was not secured since the mortgage for Loan 25 had been released. The Plaintiff and the Debtors entered into a new loan, Loan 24, with a credit limit of $150,708.02 on April 14, 2006 ("New Loan 24").[15] No new credit was extended, and Loans 25 and 26 were consolidated into New Loan 24. New Loan 24 was entered into for the sole purpose of securing the credit already obtained by the Debtors.

The Debtors knew the Property had insufficient equity to support two open home equity loans. They did not contact the Plaintiff to inquire why their statements and the on-line service showed Loan 25 as open. Rebecca Bumgarner admitted the first withdrawal of $1,000.00 from Loan 25 on December 16, 2005 "was a test." Receiving no communications from the Plaintiff regarding the "test" withdrawal, the Debtors made more withdrawals expending the credit line. The Debtors did not return the funds to the Plaintiff.

The Debtors' bank statements issued by the Plaintiff prior to December 2005 (and post-payoff of Loan 25) set forth "$0.00" as the "New Payment" and "Total Pmt Due."

---

[15] Plaintiff's Exh. No. 11.

Their bank statements, after the "test" withdrawal was made in December 2005, set forth monthly payment amounts for Loan 25 with payment due dates. The monthly payment amounts increased as the Loan 25 withdrawals increased. The Debtors made each monthly payment in accordance with the terms of the bank statements.[16]

A plaintiff's burden of proof in a nondischargeability action is substantial. The Plaintiff is required to establish by a preponderance of the evidence: (i) the Debtors made a false representation to deceive the Plaintiff; (ii) the Plaintiff relied on the misrepresentation; (iii) the reliance was justified; and (iv) the Plaintiff sustained a loss as a result of the misrepresentation.

The Plaintiff plead it "justifiably relied on the false representations of the Defendants." [17] The Plaintiff presented no evidence establishing it relied on false representations by the Debtors. It presented no evidence any such reliance was justifiable. The Plaintiff has not established the required second and third elements for nondischargeability of the indebtedness. The indebtedness of $68,198.00 owed by the Debtors to the Plaintiff is dischargeable.

## CONCLUSIONS OF LAW

The party objecting to the dischargeability of a debt carries the burden of proof and the standard of proof is preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291 (1991); Fed. R. Bankr. P. 4005 (2006). Exceptions to discharge "should be

---

[16] Debtors' Exh. No. 1. The December 2005 statement sets forth "New Payment" of" $100.00" and "Total Pmt Due on 15 JAN06" of "$100.00" for Loan 25. The Debtors paid $100.00 on Loan 25 on January 2, 2006, as reflected in their January 2006 statement. The January 2006 statement sets forth "New Payment" of "$269.00" and "Total Pmt Due on 20FEB06" of "$269.00" for Loan 25. They paid $269.00 on Loan 25 on February 2, 2006. The February 2006 statement sets forth "New Payment" of "436.00" and "Total Pmt Due on 20MAR06" of "436.00." The Debtors paid $436.00 on March 7, 2006. The March 2006 statement sets forth "New Payment" of "496.00" and "Total Pmt Due on 20APR06" of "$496.00."

[17] Id. at ¶ 20.

strictly construed against the creditor and liberally in favor of the debtor." In re Hunter, 780 F.2d 1577, 1579 (11th Cir. 1986).

The Plaintiff contends the debt of $68,198.00 should be excepted from discharge pursuant to 11 U.S.C. Section 523(a)(2)(A), which provides a discharge pursuant to Section 727 does not discharge an individual from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—"

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A) (2006).

A plaintiff must establish the traditional elements of common law fraud to prevail in a Section 523(a)(2)(A) action. SEC v. Bilzerian (In re Bilzerian), 153 F.3d 1278, 1281 (11th Cir. 1998). A plaintiff must establish: (i) the debtor made a false representation to deceive the creditor; (ii) the creditor relied on the misrepresentation; (iii) the reliance was justified; and (iv) the creditor sustained a loss as a result of the misrepresentation. Id.; In re Johannessen, 76 F.3d 347, 350 (11th Cir. 1996). Pursuant to the Grogan decision, the objecting party must establish each of the four elements of fraud by a preponderance of the evidence. In re Wiggins, 250 B.R. 131, 134 (Bankr. M.D. Fla. 2000).

A creditor cannot establish non-dischargeability pursuant to Section 523(a)(2)(A) without proof of reliance on misstatements by the debtor. City Bank & Trust Co. v. Vann (In re Vann), 67 F.3d 277, 280 (11th Cir. 1995); In re Perkins, 52 B.R. 355, 357 (Bankr. M.D. Fla. 1985). The reliance upon the debtor's false representation must be justified. Field v. Mans, 516 U.S. 59, 73-5 (1995) (establishing Section 523(a)(2)(A) requires justifiable reliance rather than the former standard of reasonable reliance). Whether such

reliance was justified is determined by a subjective test.  In re Vann, 67 F.3d at 281. "Justifiable reliance is gauged by an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case."  Id. (citation omitted).

The Plaintiff has not established the second and third elements for non-dischargeability pursuant to Section 523(a)(2)(A).  The Plaintiff presented no evidence establishing it relied on a false representation by the Debtors in connection with the closed Loan 25 withdrawals.  It presented no evidence any such reliance was justifiable.

The Plaintiff cites First Nat. Bank of Mobile v. Roddenberry (In re Rodenberry), 701 F.2d 927 (11th Cir. 1983) in support of nondischargeability.  The Eleventh Circuit Court of Appeals held in Rodenberry credit card debts incurred by a cardholder after a bank has unconditionally revoked the cardholder's right to use and possession of the card, and the cardholder knew of such revocation, are nondischargeable.  Id. at 928.[18] Rodenberry is not determinative of the case at hand in that it does not address justifiable reliance.  It was rendered prior to the Supreme Court decision Field v. Mans requiring a plaintiff establish "justifiable" reliance as an element of a Section 523(a)(2)(A) cause of action and the Eleventh Circuit Court of Appeals' decisions defining justifiable reliance. Bilzerian, 153 F.3d at 1281-82; Johannessen, 76 F.3d at 350; Vann, 67 F.3d at 280.

The Plaintiff has not established the debt of $68,198.00 owed to the Plaintiff by the Debtors is nondischargeable pursuant to 11 U.S.C. Section 523(a)(2)(A).

---

[18] The Eleventh Circuit Court of Appeals did not make a determination as to the dischargeability of the credit card debt at issue, but reversed and remanded the case to the bankruptcy court for a determination of whether the plaintiff bank unconditionally revoked the debtors' right to all use and possession of the credit cards and, if it did so, when such revocation was communicated to the debtor wife.

A separate Judgment in favor of the Debtors and against the Plaintiff consistent with these Findings of Fact and Conclusions of Law shall be entered contemporaneously.

Dated this 18th day of December, 2007.

ARTHUR B. BRISKMAN
United States Bankruptcy Judge

10